**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

METROPOLITAN LIFE INS. CO.,

    Plaintiff,

Case No. 14-CV-11525-DT

v.

HON. DENISE PAGE HOOD

PHYLLIS HOENSTINE, MARCUS W.
MILLARD and R.S.H. (a minor),

    Defendants.
_____

PHYLLIS HOENSTINE and R.S.H. (a minor),

    Cross-Plaintiffs/Counter-Defendants,

v.

MARCUS W. MILLARD,

    Cross-Defendant/Counter-Plaintiff.
_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.    INTRODUCTION**

Metropolitan Life Insurance Company ("Metropolitan Life") filed this interpleader action on April 15, 2014 against Phyllis Hoenstine, the decedent's sister, Marcus W. Millard, a caretaker, and R.S.H., the decedent's minor grandson. All three defendants made claims for the

1

proceeds of the decedent Robert Hynds' life insurance benefits under a group life insurance policy issued by Metropolitan Life through Hynds' employer, General Motors. The life insurance benefit was part of the General Motors Life and Disability Program (the "Plan"), an employee welfare benefit plan regulated by the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.*

Hynds died on July 22, 2013. The primary beneficiary of record pursuant to the latest designation form dated December 3, 2011 is Millard. In a prior March 9, 2008 beneficiary designation form, Hoenstine, the decedent's sister, and R.S.H., the decedent's grandson, were named as primary beneficiaries. Metropolitan Life sent letters to Hoenstine, R.S.H. and Millard indicating their claims were adverse to one another and that Metropolitan Life could not resolve the issue without exposing the Plan to the danger of double liability. Metropolitan Life deposited the proceeds of the insurance policy into the Court and was dismissed from this action.

The case then proceeded on Hoenstine's claim that Millard had falsified the change of beneficiary forms filed by decedent or that Millard had unduly influenced decedent to change the insurance policy beneficiary. Pursuant to Rule 52(a) of the Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

## II. JURISDICTION

The jurisdiction of the Court is not in dispute.

## III. FINDINGS OF FACTS

Decedent and policyholder Hynds lived alone and was blind. He was in need of physical care and help with his daily meals and other affairs. For a time, Hoenstine's son, Steve Hoenstine, took care of Hynds. When her son took care of Hynds, Hoenstine and R.S.H. would visit her brother and Hynds would play with R.S.H. R.S.H.'s mother, Hynds' daughter, died when R.S.H. was two years old. R.S.H. lived with Hynds until R.S.H. was four years old. R.S.H. was ten years old when Hynds died.

Hoenstine claims that Hynds told her that the insurance money should go to R.H.S. Hoenstine was familiar with Hynds' signature, but she did not recognize the signature on the Metropolitan Life forms shown to her at trial.

In July 2011, Millard came to help Hynds and lived with Hynds for about six months until January 2012. Millard was a friend of Steve, Hynds' nephew and previous caregiver. Millard's fiancée and children also stayed at Hynds' home some of this time, although Millard claims his children never lived at the home. Hynds paid Millard and his fiancée approximately

$900 per month for caring for him. Millard would read Hynds' mail to him, which were mostly bills. Hynds saved his records in folders. Millard, his fiancée, his mother, Katherine Millard, and some of Hynds' friends would drive Hynds to do his errands. Millard would take Hynds to the bank when Hynds got paid, which was twice a month. Millard paid his bills in cash. Millard's mother would drive Hynds and Millard around town to pay Hynds' bills and buy cigarettes. Millard cleaned and cooked Hynds' meals. Millard was able to shower himself. Millard claims he was not interested in Hynds' money.

Millard did not see Hynds fill out the two beneficiary forms. Millard was not present when Hynds signed the forms. Millard does not know how Hynds possessed the beneficiary forms. Millard claims that Hynds was capable of signing forms if his hand was placed on the signature line. Hynds had signed forms for nurses who visited him. Millard asserts he does not know what Hynds' signature looks like.

Hoenstine did not feel comfortable at Hynds' home when Millard, his fiancée and children lived there. She visited her brother a couple of times while Millard lived there, but would not stay for very long. Hoenstine initially had the ability to call her brother, until Millard took the telephone away from her brother.

Hoenstine claims that Millard fraudulently executed a new beneficiary on Hynds' insurance policy or unduly influenced him to change the policy beneficiary during the time Millard lived with and cared for him. Millard asserts that he was only a "helper" and never assisted him in changing the beneficiary. Millard claims he had no knowledge of the beneficiary designation until after Hynds died. The first change of beneficiary was on November 11, 2011 and the second on December 3, 2011.

In January 2012, Hoenstine removed Hynds from his home and placed him in a nursing facility. She did this based on reports that Hynds was living in "deplorable" conditions. According to Nona Vickers, a witness at trial, Hynds' house was in poor condition, that she found that Hynds had messed himself and messed all over the bathroom. She said that Hynds told her that Millard had taken his telephone from him so that he could not call out and Millard and his fiancée had abandoned him. He had not eaten in several days. Hoenstine first took her brother to the hospital and then to a home health care facility.

Connie McNeal, from the home health care facility, testified that when Hynds came to the facility, he was underweight and malnourished. McNeal learned that Millard beat Hynds for urinating on himself and that Hynds did not like having Millard's children in the home. McNeal also learned that

Hynds would give the caregiver the money to pay the house note, but that the note did not get paid and Hynds lost his house. Hoenstine, her son and daughter, and R.S.H. would visit Hynds. Hynds was always happy when Hoenstine and R.S.H. would visit. McNeal observed a normal and loving interaction between Hynds and R.S.H.

Hoenstine and Millard agree that Hynds was able to handle his financial affairs at the time of these claims. The parties agree that Hynds was independent in his personal affairs and strong-willed. Millard claims that Hynds chose to spend the 2011 Thanksgiving holiday with Millard rather than accepting the invitation of Hoenstine. Hoenstine asserts that Hynds spent either the 2011 Thanksgiving or Christmas holiday with her.

## IV. CONCLUSIONS OF LAW

Federal law governs this matter because it involves an employee welfare benefit plant that is governed by ERISA. *Tinsley v. General Motors Corp.,* 227 F.3d 700, 703 (6th Cir. 2000). ERISA preempts any state law that relates to, or "has a connection with or reference to" an ERISA-covered plan. *Id.* (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97 (1983); *see* 29 U.S.C. § 1144(a)). Claims touching on the designation of a beneficiary of an ERISA-governed plan fall under ERISA's broad preemptive reach and

are consequently governed by federal law. *Id.* at 704 (citing *Metropolitan Life Ins. Co. v. Marsh,* 119 F.3d 415, 420 (6th Cir. 1997)). Questions regarding competing claimants to proceeds of insurance policies due to alleged forgery on the beneficiary designation change form or any alleged exercise of undue influence are preempted by ERISA and governed by federal law. *Id.* Courts "look to either the statutory language or, finding no answer there, to federal common law which, if not clear, may draw guidance from analogous state law." *Id.*

Drawing from shared general principles to guide the federal-common-law analysis of an undue influence claim, the Sixth Circuit identified a number of factors the Court may use to determine whether undue influence has been exerted in a given case, including: the physical and mental condition of the benefactor; whether the benefactor was given any disinterested advice with respect to the disputed transaction; the "unnaturalness" of the gift; the beneficiary's role in procuring the benefit and the beneficiary's possession of the document conferring the benefit; coercive or threatening acts on the part of the beneficiary, including efforts to restrict contact between the benefactor and his relatives; control of the benefactor's financial affairs by the beneficiary; and the nature and length of the relationship between the beneficiary and the benefactor*. Id.* at 705.

The inquiry into the exercise of undue influence is highly fact-intensive. Because "of the subtle and often covert ways in which undue influence may be exercised, it must often be proven by means of circumstantial evidence." *Id.*

The Court, relative to these factors, finds that Hynds was blind and physically infirm making him vulnerable and susceptible to undue influence. Although each party has indicated that Hynds seemed mentally competent and able to take care of his affairs, Millard also admitted he helped Hynds with his banking and took him to the bank. Even though Hynds paid for Millard's care of Hynds, Millard moved his family into Hynds' home, used Hynds' money to feed Millard's family. Millard had full access to the home of this blind person. Millard took the telephone when he left Hynds alone, isolating him from his family and other people. There is no evidence that Hynds received any disinterested advice from Millard. However, there is evidence that Hynds wanted to leave his policy to his grandson.

As to the "unnaturalness" of the gift, Millard only knew Hynds for about six months, all of that in the capacity of a caregiver. There was no indication that Hynds was especially otherwise connected to Millard. Millard makes much of Hynds' decision to spend the Thanksgiving holiday with Millard's family instead of Hynds' sister, Hoenstine. The beneficiary change

was made shortly before Thanksgiving and then again a few weeks after, but before Hynds was removed from his home. The Court does not find Hynds' decision regarding the Thanksgiving holiday deserves significant weight, because Hoenstine testified that Hynds spent either Thanksgiving or Christmas with her.

There is no direct evidence to indicate that Millard played a role in procuring the benefit or his possession of the document procuring the benefit. It is only speculation that Millard assisted Hynds in obtaining the beneficiary forms. Of course, his unlimited access to Hynds and his home (coupled with Hynds' blindness) support an argument that Millard coerced Hynds to change the beneficiary or Millard changed it himself. Hynds was unable to drive and was driven around by Millard or Millard's mother. Millard admitted he opened Hynds' mail and had full access to his records. There is also some evidence of the ability of Millard to control Hynds' financial affairs. The Court notes it could be reasonably inferred that Millard is likely person to have assisted Hynds with obtaining any change of beneficiary form. Millard, though he assisted Hynds with his banking, could not recognize Hynds' writing on the beneficiary designation form. Millard claims that he first learned he was the beneficiary from Hoenstine and had no copy of the document.

There is evidence that Millard isolated Hynds by taking his telephone. This is demonstrative of an effort to restrict contact between the benefactor and his relatives. However, there is also evidence that Hoenstine visited her brother on occasion at his home, but that she felt uncomfortable.

As to the nature and length of the relationship between the beneficiary and benefactor, Hynds knew Millard just a few months.

Sufficient evidence, albeit circumstantial, has been presented to show that Millard was a confidant or acted as Hynds' fiduciary, that he benefited from the change of beneficiary transaction and that he had the opportunity to influence Hynds' decision in the transaction. No one else had access to Hynds' mail and financial records during the time period when the beneficiary form was changed, other than Millard. Millard suggests an array of other scenarios and persons who could have influenced or assisted Hynds in changing the beneficiary. Yet, it is of note that none of them benefited from such a change.

The Court finds the evidence supports a finding of undue influence by Millard based on the various factors noted by the Sixth Circuit. As such, the insurance proceeds are awarded to Hoenstine and R.S.H. as noted in the Beneficiary Designation form dated and signed by Hynds on March 9,

2008. Metropolitan Life and/or Hoenstine and R.S.H. may present the appropriate withdrawal order to the Court pursuant to E.D. Mich. LR 67.1, after reviewed and approved by the Clerk's Office (Financial Department).

IT IS SO ORDERED.  This action is deemed CLOSED on the docket.


Dated:  September 13, 2017          <u>s/Denise Page Hood</u>
                                                   Chief, U.S. District Court


I hereby certify that a copy of the foregoing document was served upon counsel of record on September 13, 2017, by electronic and/or ordinary mail.


            <u>s/Julie Owens acting in the absence of LaShawn R. Saulsberry</u>
            Case Manager